*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2013 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE MATTER OF THE UNITED EFFORT PLAN TRUST

JOHN E. SWALLOW,
*Petitioner and Appellee,*

BRUCE WISAN; WILLIAM JESSOP; RICHARD JESSOP REAM; THOMAS
SAMUEL STEED; DON RONALD FISCHER; DEAN JOSEPH BARLOW;
WALTER SCOTT FISCHER; RICHARD GILBERT; BRENT JEFFS; HELAMAN
BARLOW; HILDALE CITY; COLORADO CITY; TWIN CITIES WATER
AUTHORITY; DAN JOHNSON; MERLIN JESSOP; SNOW, CHRISTENSEN &
MARTINEAU; and STATE OF ARIZONA,
*Other Parties and Appellees,*

*v.*

WILLIE JESSOP; DAN JOHNSON; MERLIN JESSOP; LYLE JEFFS;
and JAMES OLER
*Intervenors and Appellants.*

No. 20090691
Filed January 29, 2013

Third District, Salt Lake
The Honorable Denise P. Lindberg
No. 053900848

Attorneys:

Bridget K. Romano, Utah Solicitor Gen., Timothy A. Bodily, Asst.
Att'y Gen., Jeffrey L. Shields, Zachary T. Shields, Mark L.
Callister, Spencer E. Austin, Mark W. Dykes, Brandon J. Mark,
Salt Lake City, David Weinzweig, Phoenix, AZ,
for appellees

James C. Bradshaw, Rodney R. Parker, Richard A. Van Wagoner,
Frederick Mark Gedicks, Kenneth A. Okazaki, Stephen C. Clark,
Salt Lake City, for appellants

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

Justice Lee, opinion of the Court:

¶1    This case arises out of the district court's denial of several motions to intervene in the ongoing state administration of the United Effort Plan Trust. This charitable trust was originally established by members of what is now referred to as the Fundamentalist Church of Jesus Christ of Latter-Day Saints. In 2006, following allegations of trustee mismanagement, the district court removed these trustees, reformed the Trust according to secular principles, and appointed a special fiduciary to manage the Trust subject to the district court's ongoing supervisory jurisdiction.

¶2    When the special fiduciary sought court approval for the sale of Trust property with alleged religious significance, the appellants in this case—members and bishops of the FLDS church—asserted that their ecclesiastical interests in the Trust entitled them to intervene as of right under rule 24 of the Utah Rules of Civil Procedure in the ongoing administration proceedings. The district court denied intervention, concluding that appellants' asserted interests were inadequate. The potential intervenors appealed. We affirm. Under standards of review clarified below, we uphold the district court's determinations that appellants lacked a statutory right to intervene under rule 24(a)(1) and also lacked a sufficient interest in the subject matter of the litigation to intervene under rule 24(a)(2).

I

¶3    The United Effort Plan Trust was originally established in 1942 by members of a religious movement known as the Priesthood Work, a predecessor to the Fundamentalist Church of Jesus Christ of Latter-Day Saints. Adherents to the tenets of this movement purchased a number of properties and deeded them to the Trust. In 1998, following litigation with some disaffected Trust beneficiaries, the trustees amended the Trust, rendering it a charitable trust under Utah law.

¶4    In 2004, the Trust was named as defendant in several tort actions. The Trust faced a risk of defaulting in these suits because the then-trustees failed to defend them. Consequently, in May 2005 the Utah Attorney General's Office petitioned the district court to remove the trustees for breaching their fiduciary duties to the Trust. The court granted that request and appointed a special fiduciary to manage the Trust going forward. The court subse-

quently confirmed that the Trust was now a charitable trust and held that it needed to be reformed because several of its provisions were unworkable. The district court did so in an October 2006 court order, and nearly three years passed before any party sought to appeal or otherwise challenge it. When a challenge eventually reached this court, we held that it was barred by laches. *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 1, 238 P.3d 1054.

¶5   As reformed by the 2006 court order, the Trust provides that the "Trust Property shall be held, used and distributed to provide for [beneficiaries], . . . according to their wants and their needs insofar as their wants are just." "[J]ust wants and needs concern primarily housing" and "secondarily . . . education, . . . occupational training[,] and economic development," although they "may also include food, clothing, [and] medical needs" and even "community development, including, but not limited to, community buildings and places, schools, parks and cemeteries, etc."

¶6   Potential beneficiaries are defined as those "(1) who can demonstrate that they have previously made Contributions to either the Trust or the FLDS Church; or (2) who subsequent to the date of this Agreement make documented Contributions to the Trust which Contributions are approved by the Board." Thus, "the beneficiaries of the Trust are large in number" and although they "constitute a definite class," "the beneficiaries within the class are indefinite."

¶7   Most significantly for purposes of this appeal, the reformed Trust is decidedly secular. The reformed Trust declaration states that the "administration of the Trust shall be based on neutral principles of law," and "shall not be based on religious doctrine or practices." It expressly prohibits "attempt[ing] to resolve underlying controversies over religious doctrine," although it does note that "[t]he reformation shall allow for ecclesiastical input of a non-binding nature." This input may include "recommendations received from an authorized representative of the FLDS Church concerning" whether "a particular Trust Participant's" "wants and needs" are "just . . . in light of the religious principles of the FLDS Church," although such recommendations are "non-binding and shall be only one criterion to be considered and shall not be the controlling criterion."

3

¶8    After the Trust was reformed, the district court retained supervisory jurisdiction over its administration. In May 2009, the special fiduciary sought court approval for the sale of certain property in order to meet the Trust's ongoing financial obligations. In particular, the fiduciary sought to sell the Berry Knoll Farm. Within the weeks immediately following the fiduciary's application to sell Berry Knoll, two motions to intervene were filed based on rule 24(a) of the Utah Rules of Civil Procedure. This rule provides:

> Upon timely application anyone shall be permitted to intervene in an action:
>
> (1) [W]hen a statute confers an unconditional right to intervene; or
>
> (2) [W]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

UTAH R. CIV. P. 24(a).

¶9    The first of the two rule 24(a) motions was filed by appellants Willie Jessop, Dan Johnson, and Merlin Jessop (the "Appellant Church Members"). They filed this motion in their capacity as FLDS Church members, claiming that they had "been granted a stewardship over the specific Trust property that is the subject" of the proposed sale and that the property was essential to the "discharge [of] their sacred priesthood stewardships."

¶10   The second rule 24(a) motion was filed by appellants Lyle Jeffs and James Oler (the "Appellant Bishops"). The Appellant Bishops claimed that their priesthood "responsibilities extend to ascertaining and meeting the just wants and needs of Trust beneficiaries." They noted that their ecclesiastical position as bishops gave them a "unique interest in Berry Knoll," because "as Bishops, they ha[d] the sacred priesthood charge, pursuant to scripture and belief, to ensure that the just wants and needs of their respective congregations are met," and further asserted that their "eternal salvation [was] intimately connected with how well they discharge[d] this duty."

¶11 Following oral argument, the district court denied both motions to intervene. The court's ruling stated:

> Categorical assertions of interest with respect to Trust property are insufficient to establish a right to intervene under Rule 24(a). What proposed Intervenors must show — which they have not — is that they have a legally cognizable interest in any Trust property. Any "claim of interest" under Rule 24 must have a legal basis; without it, no claimant has a right to a remedy and, therefore, no right to participate in the case as a party. . . . It is black letter law that potential beneficiaries of charitable trusts have no right to make claims upon such trusts. Because the UEP Trust is a charitable trust, the only individuals with legally cognizable interests are the Utah and Arizona Attorneys General . . . as representatives of the community, and the Court-designated Special Fiduciary.

¶12 Although the court denied the intervention motions, this ruling did not prevent the potential intervenors from participating in the dialogue relating to the proposed sale of Berry Knoll. In fact, the same order that denied the intervention motions scheduled a public hearing on the proposed sale. At this hearing, both current and former members of the FLDS Church were allowed to give their input. Following the hearing, the district court issued a written order allowing the sale of the Berry Knoll Farm.

¶13 Despite the participation they were afforded at the public hearing, both groups of potential intervenors appealed the denial of their motions to intervene. We held oral argument in late 2010, but subsequently stayed further proceedings pending the resolution of parallel proceedings in federal court. These parallel proceedings were resolved in a November 5, 2012 opinion by the Tenth Circuit, *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1299, 1302 (10th Cir. 2012), clearing the way for our resolution of the potential intervenors' appeal.

II

¶14 Appellants challenge the denial of their motion to intervene under rule 24(a) of the Utah Rules of Civil Procedure. They make two principal arguments in support of this contention, one based

on rule 24(a)(1) and the other on rule 24(a)(2). We affirm under standards of review clarified below.

A

¶15  Before considering the merits, we address the appropriate standards of review under rules 24(a)(1) and 24(a)(2). In our prior cases, we have sometimes stated that the appropriate standard of review under rule 24(a) is de novo.[1] But in our most recent opinion addressing the rule 24(a) standard of review, *Taylor-West Weber Water Improvement District v. Olds*, 2009 UT 86, ¶ 3, 224 P.3d 709, we clarified that a motion to intervene sometimes "involves questions of law and fact," *id.* (citing *Moreno v. Bd. of Educ.*, 926 P.2d 886, 888 (Utah 1996)), and noted that while "[w]e review the district court's legal determinations for correctness," we will not disturb the court's factual findings "unless they are clearly erroneous," *id.* (citing *Moreno*, 926 P.2d at 888). Thus, our recent rule 24(a) jurisprudence evidences movement toward a more nuanced understanding of the appropriate standard for reviewing rule 24(a) intervention decisions. And our recent decision in *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, __ P.3d __, provides insights that permit further refinement.

¶16  In *Baby B* we started with the "key" threshold question "whether the trial court's decision qualifies as a finding of fact, a conclusion of law, or a determination of a mixed question of law and fact." *Id.* ¶ 40. We also clarified the boundaries of each of these categories and explained the theoretical underpinnings of the standards of review that apply to each.

¶17 Findings of fact "entail[] the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind." *Id.* (alteration in original) (internal quotation marks omitted). And factual determinations are "entitled to the most deference" (review for "clear error"), because (a) a "lower court often has a comparative advantage in its firsthand access to factual evidence," and (b) there is "no particular benefit in establishing settled appellate precedent on issues of fact," since such issues are unique to each case. *Id.* ¶¶ 40, 52. Given this highly deferential standard, fact findings should

---

[1] *See, e.g., Parduhn v. Bennett*, 2005 UT 22, ¶ 13, 112 P.3d 495; *In re Marriage of Gonzalez*, 2000 UT 28, ¶ 16, 1 P.3d 1074.

be "overturned only when clearly erroneous." *Id.* ¶ 40 (internal quotation marks omitted).

¶18 Conclusions of law, by contrast, involve "abstract legal questions." *Id.* ¶ 41. They are reviewed under a standard "at the other end of the spectrum": de novo. *Id.* "No deference is given to the lower court's analysis of abstract legal questions . . . because the lower court has no comparative advantage in resolving legal questions and settled appellate precedent is of crucial importance in establishing a clear, uniform body of law." *Id.*

¶19 "Mixed questions fall somewhere in the twilight between deferential review of findings of fact and searching reconsideration of conclusions of law." *Id.* ¶ 42. They "involv[e] application of a legal standard to a set of facts unique to a particular case." *Id.* The standard of review applied to these types of questions "depends on the nature of the issue and the marginal costs and benefits of a less deferential, more heavy-handed appellate touch." *Id.* In circumstances where we afford "deference" to mixed-question determinations, this deference "rests on the notion that the mixed finding is *not* 'law-like' because it does not lend itself to consistent resolution by a uniform body of appellate precedent, and/or on the premise that the mixed finding *is* 'fact-like' because the trial court is in a superior position to decide it." *Id.*

¶20 A determination of "negligence in a personal injury suit arising out of an automobile accident," is just such a determination because "[t]he particular facts and circumstances of the drivers' conduct are likely to be so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out." *Id.* ¶ 43 (internal quotation marks omitted). On the other hand, whether a common set of recurring law enforcement practices qualifies as a "reasonable" search or seizure warrants more searching review. *Id.* ¶ 44 (internal quotation marks omitted). There is a significant upside to such probing review because "both law enforcement and the general public ought to be able to rely on a consistent rule established by set appellate precedent as to the reasonableness of certain law enforcement procedures," and these decisions "turn on the general reasonableness of those practices and not so much on the demeanor or credibility of a particular witness." *Id.*

¶21 These principles inform our analysis of the standard of review under rule 24(a). A determination under rule 24(a)(1), which permits intervention "when a statute confers an unconditional right to intervene," UTAH R. CIV. P. 24(a)(1), implicates two questions. The first—whether a particular statute affords a particular class of persons an unconditional intervention right—is a pure question of law because it involves abstract statutory construction. A district court would not be entitled to any deference to the extent it misinterpreted an intervention statute in the abstract. But the second question—whether a particular individual actually fits within the class of persons entitled to intervene under a statute—presents a classic mixed question because it "involv[es] application of a legal standard to a set of facts unique to a particular case." *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42. These mixed-question determinations would be entitled to varying degrees of deference. *Id.* Some determinations might turn on statutory classifications that were sufficiently clear-cut and recurring that they would be subjected to fairly searching appellate review, much like "reasonableness" determinations under the Fourth Amendment. Other determinations might instead turn on nuanced, fact-intensive assessments more akin to negligence determinations in auto accident cases. These types of determinations would be given significant deference under the framework articulated above. Thus, rule 24(a)(1) mixed determinations are entitled to varying degrees of appellate deference.

¶22 Rule 24(a)(2) intervention determinations likewise implicate a range of degrees of deference. Under this provision, a district court must assess (a) whether the potential intervenor claims an interest relating to the property or transaction that is the subject of the action, (b) whether the intervenor's ability to protect that interest may be practically impaired or impeded by the disposition of the action, and (c) whether the intervenor's interest is adequately represented by existing parties. *See* UTAH R. CIV. P. 24(a)(2); *Parduhn v. Bennett,* 2005 UT 22, ¶ 13, 112 P.3d 495. The first of these inquiries involves a cold-paper review of the pleadings—to evaluate whether the would-be intervenor "claims" an interest in the subject-matter of the litigation. Although the inquiry might not lend itself to clear resolution by extensive appellate precedent, it is not a fact-intensive one on which the district court would enjoy a comparative advantage, as we are in as good a position as the district court to review the pleadings. The analy-

sis of whether an intervenor "claims" an interest in the subject-matter of the litigation, therefore, is a matter for relatively rigorous appellate scrutiny, with little deference to the district court's analysis of the claims in the pleadings. *Cf. Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶¶ 2, 14, 243 P.3d 1275 (holding that assessment of "claim[s]" under rule 12(b)(6) is subject to de novo appellate review because it depends on allegations appearing on the face of the complaint (internal quotation marks omitted)).

¶23 The other two inquiries are more fact-intensive, however, and thus subject to deferential review. In analyzing whether an intervenor's interest may be impaired or impeded as a practical matter, or whether existing parties will adequately represent the intervenor's interest, the district court typically will draw upon its knowledge and understanding of the facts and circumstances of the case. These are fact-bound inquiries requiring first-hand knowledge of the nuances of a case. Review of these mixed determinations is accordingly deferential.

¶24 And of course the ultimate determination regarding intervention under rule 24(a)(2) would also be subject to deferential review. By nature, this determination—balancing the three inquiries outlined above—is a discretionary, case-specific one that does not "lend itself to consistent resolution by a uniform body of appellate precedent." *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42.[2] We accordingly review rule 24(a)(2) determinations deferentially, even though at least one element of the analysis (regarding the assertion of a "claim") is reviewed de novo.

B

¶25 Appellants advance two principal contentions subject to our review under the above standards. First, they assert that the

---

[2] *See also United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984) ("The various components of [rule 24(a)(2)] are not bright lines, but ranges—not all 'interests' are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate . . . . Application of the Rule requires that its components be read not discretely, but together . . . [and] common sense demands that consideration also be given to matters that shape a particular action or particular type of action.").

district court erred in declining to allow intervention under rule 24(a)(1), which provides for mandatory intervention "when a statute confers an unconditional right to intervene." UTAH R. CIV. P. 24(a)(1). They claim that Utah Code section 75-7-405(3) gives them such a right. It states that "[t]he settlor of a charitable trust, among *others*, may maintain a proceeding to enforce the trust." UTAH CODE § 75-7-405(3) (emphasis added). According to appellants, the statute's reference to "others" refers to those individuals satisfying the "special interest" exception to the general rule denying charitable beneficiaries standing to enforce a trust. They further assert that they fall within this exception.

¶26 Under the common law rule, suits to enforce the terms of charitable trusts generally may not be maintained by trust beneficiaries. *See* RESTATEMENT (SECOND) OF TRUSTS § 391 (explaining that only a few limited groups of individuals—including "the Attorney General or other public officer"—are entitled to enforce a charitable trust). This general rule denying standing to potential trust beneficiaries is not surprising. In its absence, charitable trusts could "frequently be subjected to unreasonable and vexatious litigation" because beneficiaries are generally "some or all of the members of a large shifting class of the public." GEORGE G. BOGERT ET AL., THE LAW OF TRUSTS AND TRUSTEES § 411 (2d ed. 1991). This potential for unlimited litigation would be problematic given that charitable trusts are created to serve the public good and have finite resources. The larger the group of individuals that is permitted to meddle with charitable trust management decisions, the more likely that trust resources will be diverted from the trust's charitable, public-good purposes and devoted instead to litigation costs and attorney fees.

¶27 But despite the powerful policy considerations underlying this general rule, it is not absolute. Some courts have created a narrow exception for beneficiaries deemed to have a "special interest" in the administration of a charitable trust. *See, e.g.*, *Hooker v. Edes Home*, 579 A.2d 608, 614 (D.C. 1990). We have not yet recognized this "special interest" exception. And examination of the "special interest" jurisprudence in other jurisdictions demonstrates that the contours of the exception are ill-defined.[3] To the

---

[3] *See* Mary Grace Blasko et al., *Standing to Sue in the Charitable Sector*, 28 U.S.F. L. REV. 37, 61 (Fall 1993) (identifying five "ele-

extent there is consensus, however, appellants assert that the "special interest" caselaw has primarily focused on two factors: (1) whether the person invoking the exception is among a class of potential beneficiaries that is sharply defined and limited in number, and (2) whether the challenge is to an act of "fundamental" nature, rather than a challenge to the trustee's normal exercise of discretion.

¶28 For purposes of our analysis here, we need not decide whether Utah Code section 75-7-405(3)'s reference to "others" encompasses the special interest exception as defined by the caselaw cited by appellants. Even assuming *arguendo* that it does, appellants' reliance on the special interest exception is unavailing for two reasons.

¶29 First, the mere statement that certain other individuals "may maintain a proceeding to enforce [a] trust," *see* UTAH CODE § 75-7-405(3), does not obviously trigger rule 24(a)(1), which allows intervention only where "a statute confers an unconditional right to intervene," UTAH R. CIV. P. 24(a)(1). This statutory section, after all, says nothing about intervention. And courts interpreting the federal counterpart to our rule 24 "have been hesitant to find an unconditional statutory right of intervention"[4] *unless* a statute expressly grants such a right. 7C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1906 (3d ed. 2012).[5] Thus,

---

ments" from the relevant caselaw "across state jurisdictions" that "influence a court's willingness to allow a private party to sue for the enforcement of charitable obligations," one of which is "subjective and case-specific factual circumstances," and noting that "[t]he presence of any one of these factors by itself can lead a court to decide that the plaintiff has a special interest in a charity").

[4] It is an "unusual situation[] in which there is an unconditional statutory right to intervene." 7C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1908 (3d ed. 2012).

[5] *See also US W. Commc'ns, Inc. v. TCG Seattle*, 971 F. Supp. 1365, 1368 (W.D. Wash. 1997) (concluding that 28 U.S.C. § 2403(a), which provides that "[i]n any action, suit or proceeding in a court of the United States to which the United States or any agency, officer or employee thereof is not a party, wherein the constitution-

statutes providing express private rights of action do not automatically trigger rule 24(a)(1). *Id.*[6] That construction of the rule makes good sense as a policy matter. Broadly permissive intervention rules can allow a lawsuit to become "fruitlessly complex or unending." *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969) (plurality opinion).[7] And because a separate lawsuit does not create the same risk of generating overly complex or never-ending litigation, there are good reasons for not presupposing that a statute affording a private right of action also creates an unequivocal right of intervention. Thus, section 75-7-405(3)'s creation of a right to "maintain a proceeding to enforce [a] trust" does not appear to afford appellants the right to intervene under rule 24(a)(1).

¶30 Second, even assuming that the cited statute were enough to establish an unequivocal right to intervene in the class of persons with a "special interest," it is not clear that appellants qualify for that class. And the district court's "mixed question" determination that they do not is entitled to deference. A district judge who supervises a charitable trust's administration on an ongoing basis is in a better position than we are to make the fact-bound assessments of (a) whether allowing a particular group of beneficiaries to intervene creates a significant risk of future, vexatious litigation, and (b) whether a particular fiduciary decision is fun-

---

ality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence," afforded a right to intervene under rule 24(a)(1) of the Federal Rules of Civil Procedure).

[6] For example, most courts have concluded that the Fair Labor Standards Act does not provide an unconditional right to intervene, even though it provides that a suit may be maintained "by any one or more employees for and in behalf of themselves and other employees." *See* 7C WRIGHT & MILLER, *supra* note 4, § 1906 (internal quotation marks omitted).

[7] *See also United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2d Cir. 1994) ("Intervention is a procedural device that attempts to accommodate two competing policies: efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand.").

damental, as opposed to being an ordinary exercise of discretion. *See supra* ¶¶ 27–28.

¶31 In rejecting the intervenors' assertion that they fit within the "special interest" exception, the district court's order expressly incorporated a portion of the Arizona Attorney General's brief. This brief noted that the first element of the "special interest" exception was not satisfied because the "class of beneficiaries is potentially in the thousands and is indefinite." Additionally, it noted that the second element of the "special interest" exception was unsatisfied because "sale of property is an ordinary exercise of discretion, and there is no credible allegation that the trust will cease to exist if the farm is sold." Appellants have offered no persuasive reason for rejecting either of these fact-bound determinations, and we accordingly affirm them.

¶32 There was a substantial basis in the record for the district court's determination that the class of beneficiaries was sufficiently large and indefinite that permitting intervention would create the possibility of vexatious litigation. After all, the group of potential Trust beneficiaries is still open because it includes both (a) those "who can demonstrate that they have previously made Contributions to either the Trust or the FLDS Church," and (b) those "who subsequent to the date of this Agreement make documented Contributions to the Trust which Contributions are approved by the Board." And, significantly, there are already many thousands of potential trust beneficiaries. In light of these facts, the district court reasonably could have concluded that the potential for beneficiary intermeddling might overwhelm administration of the Trust in a way that would cripple its ability to effectively pursue its charitable objectives.

¶33 There is also a substantial basis for the district court's conclusion that the sale of the Berry Knoll property is nothing more than an exercise of the trustee's ordinary discretion. Although a fundamental change to the Trust did occur when it was reformed by the district court in 2006 and subsequently began operating according to secular principles, this reformation went unchallenged and any further challenges to it are barred. *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 1, 238 P.3d 1054. And the action that the potential intervenors seek to challenge—the sale of Trust property—falls squarely within the powers granted to the trustee under the reformed Trust.

There is simply nothing within the Trust document that could sustain a contrary conclusion grounded in the notion that a sale would "deprive Appellants and all FLDS faithful of physical *and* spiritual and sacred benefits of the land." The Trust does *not require* the trustee to take into account the religious significance of trust assets when contemplating their sale, even though the trustee *may choose* to take into account recommendations from authorized representatives of the FLDS Church. Appellants' reliance on rule 24(a)(1) is accordingly unavailing.

C

¶34 Appellants also assert that the district court erred in not allowing them to intervene under rule 24(a)(2). This rule permits intervention of right when four criteria are satisfied: (1) the movant filed a timely motion, (2) the movant claims "an interest in the subject matter" of the litigation, (3) the movant's "interest is or may be inadequately represented" by the present parties, and (4) the movant's interest may be impaired or impeded by a disposition in the action (so long as that interest is not adequately represented by existing parties). *See* UTAH R. CIV. P. 24(a)(2); *Parduhn*, 2005 UT 22, ¶ 13 (internal quotation marks omitted).

¶35 The district court based its denial of the rule 24(a) motion primarily on the second criterion. It noted that "categorical assertions of interest with respect to trust property are insufficient to establish a right to intervene" and concluded that the intervenors had not asserted a sufficient interest to warrant intervention. And although the specific aspect of the 24(a)(2) determination that requires assessment of whether an appellant "claims an interest relating to the property or transaction which is the subject of the action" is entitled to less deference than the other aspects of the 24(a)(2) determination, *see supra* Part II.A., in this instance we see no reason to fault the district court's determination that appellants failed to claim an interest sufficient to warrant intervention.

¶36 For reasons noted above, *see supra* Part II.B, appellants are unable to demonstrate that they satisfy the "special interest" exception to the general bar on charitable beneficiary standing. This surely provides some support for the district court's conclusion that appellants' "interest" is insufficient to support intervention, although there is some dicta in our cases indicating that independently establishing "standing" may be unnecessary where a

party otherwise meets the requirements of rule 24(a)(2). *See Taylor-W. Weber Water Improvement Dist. v. Olds*, 2009 UT 86, ¶ 6 n.2, 224 P.3d 709. We need not, however, resolve here the open issue of whether the standing question is dispositive of the rule 24 "interest" inquiry, because it is sufficiently clear that the district court did not err in concluding that the express terms of rule 24(a)(2) were not satisfied by appellants' asserted "interests."

¶37  The Appellant Bishops asserted an "interest" arising from a "sacred priesthood charge, pursuant to scripture and belief" and grounded in the "tenets of the FLDS faith," while the Appellant Church Members claimed an "interest" stemming from a "priesthood stewardship that each was granted." While we do not question the importance of these interests in the abstract, that is not the question under rule 24(a)(2). Rather, the rule requires an "interest in the subject matter of the litigation." *See* UTAH R. CIV. P. 24(a)(2); *Parduhn v. Bennett*, 2005 UT 22, ¶ 13.[8]

¶38  Rule 24(c) of the Utah Rules of Civil Procedure provides helpful context for evaluating rule 24(a)(2)'s "interest" requirement. Under 24(c), a party moving for intervention must file an accompanying "pleading setting forth the *claim or defense* for which intervention is sought." *Id.* 24(c) (emphasis added). And rule 8 of the Utah Rules of Civil Procedure, in turn, sets forth the requirements for pleading claims and defenses, requiring for the assertion of a "claim": "(1) [a] statement of the claim showing that the party is entitled to relief; and (2) [a] demand for judgment for specified relief." *Id.* 8(a). Appellants have asserted no such claim. Their purported "interests" are abstract ones, disconnected from any "demand for judgment for specified relief." Absent such a claim, we affirm the determination of the district court that appel-

---

[8] *See Interstate Land Corp. v. Patterson*, 797 P.2d 1101, 1108 (Utah Ct. App. 1990) ("The applicant's interest in the subject matter of the dispute must be a direct claim upon the subject matter of the action such that the applicant will either gain or lose by direct operation of the judgment to be rendered, not a mere, consequential, remote or conjectural possibility of being in some manner affected by the result of the original action." (internal quotation marks omitted)).

lants lacked an interest in the subject matter of the dispute sufficient to sustain their intervention under rule 24(a)(2).[9]

¶39   This litigation involved the Trust and the property administered according to its terms. Thus, the Trust necessarily delimits the scope of the "interests" that can support intervention to those that would provide an appropriate basis for granting a legal judgment or relief to a participant in the ongoing Trust administration proceedings. And the Trust's express terms provide ample support for the district court's conclusion that appellants' asserted religious interests were not interests of this type.

¶40   After all, the reformed Trust states that "administration of the trust shall be based on neutral principles of law" and "shall not be based on religious doctrine or practice." And while the Trust allows for the consideration of "ecclesiastical input," it expressly provides that such input is "non-binding" and that religion is "only one criterion to be considered, and shall not be the controlling criterion." The most generous possible reading of these provisions indicates that religious interests are entitled to be informally considered in the course of the Trust administration,[10]

---

[9] This conclusion is particularly appropriate in a case like this one where the potential intervenors sought to participate in the ongoing administration of a charitable trust. In this context, allowing a party who lacks a legally-supported claim or defense to intervene would undermine the rationale underlying the general rule of non-standing for charitable beneficiaries by permitting expansive intervention (and extensive litigation) premised on abstract "interests" not relevant under the terms of the charitable trust at issue. *See supra* ¶ 26.

[10] The district court judge's written order denying the motion to intervene noted that she had worked to ensure that these religious interests were adequately considered in the past and that she would continue to ensure that they were adequately considered in the future. Her summation of the matter shows the care the court took in considering such views, and is worth quoting at length: "Since the inception of this case the Court has agreed to consider comments from various non-parties, including interested potential beneficiaries, and has broadly noticed its hearings to anyone who is interested. Upon request, the Court has also been willing

not that these interests somehow entitle those asserting them to the formal protections and rights afforded to those with party status. And here the district court ensured that these interests were informally considered in the making of the Berry Knoll sale decision by holding a "public meeting" and permitting FLDS adherents (including some of the appellants and their counsel) to participate and present their views. Thus, in light of the secular reformation of the Trust and the very limited role that religious interests now play under it, we affirm the district court's determination that the religious interests asserted by appellants were insufficient to sustain rule 24(a)(2) intervention.

_____

to include such individuals (or their counsel) in the distribution of Court decisions. Those actions by the Court should not be understood as anything more than what they are—a courtesy to interested individuals and as a way of ensuring that the Court receives relevant input on issues affecting the Trust. The Court remains committed to receiving input from non-parties in order for the Court to be fully and fairly informed on the issues it must decide. However, the Court's courtesies should not be misunderstood to imply that the Court recognizes those individuals as having standing in the case."