Filed 4/25/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| AUTONOMOUS REGION OF NARCOTICS ANONYMOUS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> NARCOTICS ANONYMOUS WORLD SERVICES, INC., as Trustee, etc., <br><br> Defendant and Respondent. | B309376 <br><br> Los Angeles County <br> Super. Ct. No. 20STPB00821 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael C. Small, Judge.  Affirmed.

Rutan & Tucker, Michael D. Adams, Proud Usahacharoenporn and Sarah Gilmartin for Plaintiff and Appellant.

Holland & Knight, Theresa W. Middlebrook, Roger B. Coven, Jonathan H. Park and Lydia L. Lockett for Defendant and Respondent.

_____

A charitable trust controls the intellectual property of Narcotics Anonymous. This trust is revocable. A group called the Autonomous Region of Narcotics Anonymous alleged the trustee breached its fiduciary duties. The probate court sustained a demurrer without leave to amend because Autonomous Region lacked standing. We affirm.

Autonomous Region offers two infirm theories for standing.

First, Autonomous Region invokes a Probate Code section conferring standing on entities with the power to revoke a trust. Autonomous Region contends it is a settlor with that power. The trust document says otherwise: it defines the settlor as an amorphous group—the Fellowship of Narcotics Anonymous—that acts through delegates who represent groups within the Fellowship. Because Autonomous Region is not the settlor, its first theory fails.

Second, Autonomous Region claims special interest standing. This doctrine of standing is for those with a "special interest" in a charitable trust. The doctrine, however, does not extend to *revocable* trusts because the settlors of those trusts have elected to retain the power of revocation and hence the oversight this doctrine aims to supply.

The probate court properly concluded leave to amend would have been futile.

Undesignated statutory citations are to the Probate Code.

I

We take the facts from the petition and the other record materials.

A

In 1953, recovering drug addicts created the Fellowship of Narcotics Anonymous (the Fellowship). The organization uses a

2

variation of the Alcoholics Anonymous 12-step model.  Today, the Fellowship has hundreds of thousands of members who meet in groups worldwide.

Membership is permissive.  "The only requirement for membership is a desire to stop using."

Members meet in local groups.  In the United States, these cluster in about 70 geographic regions.  For instance, the "Sierra Sage Region" has an address in Reno, while the "Free State Region" address is in Baltimore.

Each region has a regional delegate.  Delegates meet every two years at a gathering called the World Service Conference.  The record sometimes refers to the Conference as an event and sometimes refers to it as the people attending the event.

The Fellowship has its own literature, which is vital to its mission.  One example is the "Basic Text," described as members' bible.  Over time, hundreds of anonymous members participated in writing and revising this book.  The Fellowship's literature includes other books as well as booklets and pamphlets.

In 1993, the Fellowship established a trust called "The NA Fellowship Intellectual Property Trust" to manage its literature and other intellectual property assets.

The trust document is the heart of this probate case.  This printed document is highly formalized and manifests authorial deliberation.  The title page, which features stylized fonts, announces in bold and centered text:  "Approved by the Fellowship of Narcotics Anonymous as given voice by its groups through their regional service representatives at the World Service Conference on 27 April 1993."  It continues in centered text:  "Operational Rules revised by the regional service

representatives at the World Service Conference on 30 April 1997, 27 April 1998, and 1 May 2012."

The table of contents is three pages in length. This table announces the document has four parts: a five-page Instrument, 17 pages of Operational Rules, 20 pages of "Reader's" Notes, and 11 pages of Intellectual Property Bulletins. The Instrument instructs that the Operational Rules are to control unless they conflict with the Instrument. The Reader's Notes explain more about the Instrument and Operational Rules. Appended to the Operational Rules are the Fellowship's "Twelve Steps and Twelve Traditions." The Reader's Notes end with a glossary. The Bulletins give comprehensive applications of the trust. For example, Bulletin number three explains how commercial vendors may use the Fellowship's trademarks.

The trust identifies itself as a "charitable trust." The parties to the trust are as follows.

The trustee is Narcotics Anonymous World Services, Inc., the respondent in this case. We abbreviate this name to "World Services."

The beneficiary is the Fellowship "as a whole."

The Instrument identifies the "Settlor and the Trustor."

We pause on a point of usage. "Trustor" and "settlor" are synonyms. (Rest.3d Trusts, § 3, com. a, p. 36.) This trust occasionally uses both terms but more commonly refers to "trustor." For consistency and to reduce confusion, however, we follow the California Probate Code and the Restatement and use "settlor." (E.g., Rest.3d Trusts, § 3, com. a, p. 36.) We often replace "trustor" with "[settlor]" when we quote from the trust.

The trust's definition of settlor is key. We will repeatedly refer to it. Other parts of the trust elaborate it.

4

The trust defines its settlor as "The Fellowship of Narcotics Anonymous, as given voice by its groups through their regional delegates at the World Service Conference."

The trust's Operational Rules add context to this definition. The Rules explain that the Fellowship is the equitable owner of the property in trust. The basic collective unit of the Fellowship is the local Narcotics Anonymous group. Because decisions about the Fellowship's intellectual properties directly affect the Fellowship as a whole as well as individual groups, the groups' authorized representatives—the regional delegates—make decisions at the Conference. "By such means, the Fellowship . . . acts as the [Settlor]" of the trust.

The Reader's Notes give more information about the trust's definition of settlor. They describe how earlier proposals defined the settlor as the Conference itself, but that drafters changed the language to name the Fellowship and its groups. This change was in part because the Fellowship is the equitable owner of the intellectual property. The Reader's Notes explain the drafters sought to give groups a role in decisions affecting them, but wanted to avoid giving any one group the power to take actions on its own that could seriously affect other groups or the Fellowship as a whole. The Reader's Notes say the final definition of settlor aimed to ensure coordinated action for decisions affecting the entire Fellowship.

The Fellowship "as given voice by its groups through their regional delegates at the World Service Conference" approved the trust. The settlor conveyed all Narcotics Anonymous intellectual property to the trust.

The trust allows the settlor to add, delete, or revise trust properties with a two-thirds vote of regional delegates at the Conference.

The Instrument assigns various duties and powers to the trustee, which, as mentioned, is respondent World Services. World Services manages proceeds from the sale of trust property. It cannot use trust property for its own profit but it can pay the costs of caring for the trust and can compensate employees.

The Instrument addresses revocability in a section titled, "ARTICLE VI: REVOCABILITY," which says, in full, "This Trust is revocable by the [Settlor]."

The Operational Rules deal with a different type of revocation—revocation of *the trustee*. Typically, this process is called "removal." (See Rest.3d Trusts, § 37, pp. 133–134.) The settlor may remove World Services as trustee and reassign its rights and duties under certain conditions. Removing the trustee requires many steps. The final step is a two-thirds vote of regional delegates at the Conference.

B

Autonomous Region launched this suit by filing a petition alleging trustee World Services had breached the trust and was violating its fiduciary duties.

Autonomous Region described itself as "an interested party" of the trust and a "regional delegate group of the Fellowship with a voice at the World Service Conference who has a special and definite interest in the charitable Trust."

The petition's prayer sought the right to distribute trust literature, to review payments to World Services, to remove World Services as trustee, to disgorge its profits, and to award

6

attorney fees to Autonomous Region. The petition cited sections 16420, 16440, and 17200 as its bases for relief.

World Services demurred, contending Autonomous Region lacked standing to sue about the trust.

World Services also disclaimed Autonomous Region. It said Autonomous Region is not a recognized region, has no role in the Fellowship, and had never been part of the World Service Conference. World Services charged Autonomous Region was merely the project of "certain dissident individuals." These factual assertions are improper in a demurrer. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

Autonomous Region opposed the demurrer. For the first time, Autonomous Region invoked section 15800, which grants standing to any entity that possesses the power of revocation. Autonomous Region argued the trust has not one but *many* settlors, Autonomous Region is one of them, and thus it has the power of revocation, which yields standing. As a second and independent basis for standing, Autonomous Region maintained it has special standing as a beneficiary or as a person with a special interest in the enforcement of the trust.

After a hearing on the demurrer, the court permitted Autonomous Region to file supplemental briefing. Autonomous Region attached extrinsic evidence to its supplemental briefing. After considering the supplemental papers, the probate court sustained World Services's demurrer without leave to amend.

## II

The probate court's order was correct. Autonomous Region offered two bases for standing: standing as a settlor and special interest standing. Neither basis is valid. The court also properly denied leave to amend because Autonomous Region did not

7

suggest a possible amendment that could overcome the legal barriers to its suit.

Our standard of review is familiar. We independently review the pleading to determine whether it alleges facts that state a cause of action. We review for abuse of discretion the court's denial of leave to amend. We assess whether there is a reasonable possibility the plaintiff could have cured the defect by amendment. The plaintiff has the burden to establish this possibility. (See *Blank*, *supra*, 39 Cal.3d at p. 318.)

Our analysis has four steps. First, we review some law about charitable trusts. Second, we engage in textual interpretation: we explain why one cannot construe the text of this trust document to make Autonomous Region its settlor. Third, we tackle special standing. Fourth, we affirm the probate court's denial of leave to amend.

A

Our tour of charitable trust law begins by defining a trust: a fiduciary relationship with respect to property that arises from a manifestation of intention to create that relationship and that subjects the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons. (See § 15200; Rest.3d Trusts, § 2, p. 17.) The term "person" includes corporations and unincorporated associations. (Rest.3d Trusts, § 3, com. e, p. 37.)

The person who creates a trust is the settlor. The property held in trust is the trust property. The person who holds property in trust is the trustee. The person for whose benefit property is held in trust is a beneficiary. (Rest.3d Trusts, § 3, p. 35.)

8

The Probate Code generally applies to charitable trusts under the jurisdiction of the Attorney General unless it conflicts with the Supervision of Trustees and Fundraisers for Charitable Purposes Act.  (Prob. Code, § 15004; see Gov. Code, §§ 12580–12599.10.)  No party claims a conflict.  Both sides apply the Probate Code.

California law about who can sue a charitable trust flowed from the pen of Justice Roger Traynor.  His landmark opinion in *Holt v. College of Osteopathic Physicians and Surgeons* (1964) 61 Cal.2d 750, 753–754, 757 (*Holt*) adopted a common law approach and made the Restatement Second of Trusts a part of California trust law.

The *Holt* opinion was in 1964.  California enacted a new Probate Code in 1990.  (Revised and Supplemental Comments to the New Probate Code (Sept. 1990) 20 Cal. Law Revision Com. Rep. (1990) p. 2005.)

The new Probate Code expressly incorporates the common law of trusts, except as modified by statute.  (§ 15002.)  California's adoption of the common law means our state's trust law continues to look "to the contemporary and evolving rules of decision" that courts develop in the "exercise of their power to adapt the law to new situations and to changing conditions." (Cal. Law Revision Com. com., 54 West's Ann. Prob. Code (1991 ed.) foll. § 15002.)

B

We turn to Autonomous Region's first standing argument. This argument relies on section 15800.  This argument collapses, however, because it is impossible to interpret the trust's text to make Autonomous Region a settlor.  We explain.

9

Section 15800 governs revocable trusts. While a trust is revocable and the person holding the power to revoke it remains competent, the trustee owes duties to the person holding the power to revoke the trust. (*Ibid.*; *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1062, 1071 (*Giraldin*).)

Autonomous Region incorrectly claims it has standing under section 15800 because it is one of *multiple* settlors and it thus holds the power of revocation. The trust's words, however, contradict this claim. Extrinsic evidence offers no support either.

To interpret a trust instrument, the instrument itself is paramount. (*Brown v. Labow* (2007) 157 Cal.App.4th 795, 812.) We construe all parts of the instrument in relation to one another to form a consistent whole. (§ 21121.) This rule manifests our respect for the intelligence and effort of the drafters, whose intent deserves our allegiance.

Autonomous Region's proposed interpretation does not comport with the trust's definition of the settlor. The evidence is overwhelming.

The text of the trust states, with our emphasis, "the" settlor is "The Fellowship of Narcotics Anonymous, *as given voice by its groups through their regional delegates* at the World Service Conference." "[T]he" settlor is singular. "[T]he" settlor means there is one settlor. The groups or delegates themselves are not settlors. Rather, the collective voice is the settlor. The trust defines "the" settlor and contemplates a single entity and a single voice.

Autonomous Region says the definition's use of plural words "groups" and "delegates" supports its interpretation, but this is erroneous. Plural component parts are irrelevant. An example illustrates the point. A class has one teacher and 25

10

students.  One student is part of the class but is not "the class." Autonomous Region claims to be a component of the settlor's voice but, when acting alone, it is not the settlor.  The trust's definition refutes Autonomous Region's assertion there are multiple settlors.

Other parts of the document explode the notion of multiple settlors.  The plural form of the words settlor or trustor never appears in the 53 pages of the trust's Instrument, Operational Rules, Reader's Notes, and Bulletins.  The Operational Rules mirror the language of the Instrument:  the Fellowship acts as "the" settlor through the regional delegates when they gather at the Conference.  This connotes a single settlor and a single voice.

More contrary text appears in the trust's provisions about removing the trustee.  "[T]he" settlor may remove the trustee.  If Autonomous Region were the settlor, it could unilaterally fire the trustee.  But the trust instead provides a process for removing the trustee.  This process requires a two-thirds vote of regional delegates, not action by a lone subset.  Revoking the trust is a more significant change than removing and replacing the trustee.  Under Autonomous Region's interpretation, two-thirds of delegates must agree to replace the trustee but a single group may revoke the whole trust.  "Absurdity" was the word the probate court used to describe the consequences of this argument.  The word is apt.

To give Autonomous Region the power of revocation, moreover, would conflict with the Fellowship's Tradition Four.  The trust document recites and embraces Tradition Four, which limits autonomy where one group's decision would affect other groups or the Fellowship as a whole.  Revoking the trust would be the epitome of affecting the Fellowship as a whole.  Tradition

11

Four thus forbids a single group within the Fellowship from acting alone to do something that affects the entire Fellowship.

The trust document decisively denies the power and status that Autonomous Region claims. This standing theory is infirm.

Autonomous Region's contrary arguments lack merit.

Autonomous Region cites a provision in the Operational Rules that allows a "regional service committee" to inspect records and operations of the trust. That the trust allows a non-settlor to *inspect records* does not imply Autonomous Region is a settlor. Rather, this provision counters Autonomous Region's position. The provision shows the trust's framers were careful to define how subsets of the Fellowship can interact with the trust and its administration. This argument fails.

Autonomous Region incorrectly complains the probate court did not consider Autonomous Region's extrinsic evidence. The court, however, said it considered the parties' supplemental briefs, which included Autonomous Region's extrinsic evidence.

Courts provisionally consider all relevant and credible evidence before determining whether a contract is susceptible to a pleaded interpretation. (*Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 39–40.)

Extrinsic evidence in this case is cause for wonder. We are reviewing a demurrer ruling, and demurrers must focus on the pleading, not on evidence. Usually it is the proponent of the pleading that is quick to object to evidence at this procedural stage, yet here that very proponent was the one that offered the declarations and documents with its supplementary briefing. Moreover, the opponent of the pleading—World Services, the author of the demurrer—does not object to these submissions.

World Services instead argues the probate court did consider this evidence, and did so properly.  What are we to make of this?

At oral argument, World Services cited *Estate of Russell* (1968) 69 Cal.2d 200, but that case does not authorize evidence at the demurrer stage.  (See *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 112–118.)

In this peculiar situation, we treat the evidentiary material Autonomous Region attached to its supplemental briefing as offers of proof to convince the probate court to grant leave to amend.

Nothing in Autonomous Region's offer of extrinsic evidence supports its claim to be a settlor.  We outline its eight documents to show why.

Five of the eight items do not aid Autonomous Region because they are consistent with the trust's text and with the probate court's interpretation.  None supports Autonomous Region's interpretation.

First is testimony from a 1991 lawsuit.  A witness said Narcotics Anonymous groups are autonomous, their autonomy is not negotiable, and groups have a role in decisionmaking.

Second are statements from a compilation of member comments from 1991 and 1992.  The statements are:

- hundreds of people helped to write the Basic Text;
- the trustee would need to act in the best interests of the collective owners; and
- the Fellowship as a whole, through its groups and members through the Conference, had the authority to create, revise, and approve literature.

Third is a letter written by a Narcotics Anonymous group to the California Attorney General from 1992 or earlier that says

13

each group is autonomous and the groups are each part-owners of the intellectual property of Narcotics Anonymous.  The letter says it would be incorrect to make the Conference the settlor because the Fellowship and its groups are the owners. Autonomous Region says this letter prompted the trust drafters to change the definition of settlor "to the current language referencing plural groups."

Fourth and fifth are the Fellowship's Tradition Four and commentary about this tradition from two editions of the Basic Text.  The texts explain a Narcotics Anonymous group is any meeting with regular and specified times and places for the purpose of recovery, provided the meeting follows the Twelve Steps and the Twelve Traditions.  The format of these meetings varies.  Autonomy is important because it allows each group to create its own atmosphere of recovery.  But, the texts warn, "autonomy can be a two-edged sword":  groups cannot be free to affect other groups or Narcotics Anonymous as a whole.  Groups must not force anything upon other groups.

These five sources are consistent with the trust's text:  lone groups have much autonomy but no subset of the Fellowship has a unilateral power to revoke the trust.

Three remaining sources of extrinsic evidence do not aid Autonomous Region.  They are either irrelevant or they predate and conflict with the trust.

Autonomous Region cites a 1988 memorandum that proposed more "autonomous flexibility" to promote worldwide development.  The memorandum proposed the *worldwide* membership rather than the *American* Fellowship should be responsible for the integrity of the Narcotics Anonymous program.  Autonomous Region's appellate briefing does not

14

explain the relevance of this worldwide versus national distinction. The memorandum also says, "Group autonomy gives each group the right to accept or reject any decision made in its behalf, even if that decision is otherwise supported or rejected by the vast majority of other N.A. groups." Whatever the structure or the debate in 1988, the trust the Fellowship established in 1993 does not give individual groups this veto authority. This evidence does not reveal latent ambiguity; it shows conflict and resolution.

Autonomous Region also cites a 1991 telephone conversation transcript in which two people said regional service committees should be the settlors. One said, "we should all be included as [settlors]" and "hypothetically, I would see the [regional service committees] acting as the agent of the beneficiary." The trust defines the parties to the trust differently from these suggestions. The words "regional service committee" are absent from the definition of settlor. The conversation does not tend to show the trust gives a single group the power of revocation. It does not disclose an ambiguous double meaning. It shows a discussion that was resolved.

Finally, Autonomous Region cites minutes from a 1991 meeting in which a director said a proposal that the settlor, trustee, and beneficiary should each be the Fellowship would create an invalid trust. This statement does not support Autonomous Region's proposed interpretation. The statement is not relevant.

In sum, the trust is not susceptible to Autonomous Region's proposed interpretation that it is a settlor. Section 15800 thus does not give Autonomous Region standing. The first standing argument is unsuccessful.

C

Autonomous Region's second theory is special interest standing. That argument fails because this suit aims to enforce a charitable trust that is *revocable*. California adopted special standing to solve "the problem of providing adequate supervision and enforcement of charitable trusts." (*Holt*, *supra*, 61 Cal.2d at p. 754.) When a charitable trust is revocable, however, the living and competent settlor provides adequate supervision and enforcement of the settlor's own trust, thus eliminating the problem that prompted the doctrine. When the problem that motivated creation of the doctrine does not exist, neither does the doctrine. There is no special standing to enforce charitable trusts that are revocable.

We begin by defining the doctrine of special standing to enforce charitable trusts. *Holt* did not attempt a general definition but instead relied upon the Restatement *Second* of Trusts. (See *Holt*, *supra*, 61 Cal.2d at pp. 753, 757.) The Restatement *Third* of Trust updated the relevant provision in 2012. (See Rest.3d Trusts, § 94, p. 4.) We italicize its definition of the doctrine:

"A suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officer or by a co-trustee or successor trustee, by a settlor, or *by another person who has a special interest in the enforcement of the trust*." (Rest.3d Trusts, § 94, subd. (2), p. 4.)

The Restatement Third gives an example of special interest standing: "if the purpose of a charitable trust is to pay the salary of the pastor of a particular church, the pastor has special-interest standing (as does the church) to enforce the trust." (Rest.3d Trusts, § 94, com. g(1), p. 9.) The Restatement Third

16

also notes that, if "a charitable trust is created to benefit the members of a described group of persons that is reasonably limited," then "one or more members of that group may be allowed to maintain a suit, on behalf of its members generally, against the trustee for enforcement of the trust. Thus, the purpose of a charitable trust to contribute to the costs of medical care for 'needy residents' of a specified small town ordinarily can be enforced by any reasonably qualified member of the community." (*Id.* at pp. 9–10.)

"The special-interest concept and its application involve a balancing of policy concerns and objectives. The special-interest requirement provides a safeguard for charitable resources and trustees by limiting the risk, and frequency, of potentially costly, unwarranted litigation; but the recognition of special-interest standing, in appropriate situations, is justified by society's interest in honoring reasonable expectations of settlors and the donor public and in enhancing enforcement of charitable trusts, in light of the limitations (of information and resources, plus other responsibilities and influences) inherent in Attorney General enforcement." (Rest.3d Trusts, § 94, com. g, p. 9.)

*Holt* concurred with this logic. (Cf. *Holt*, *supra*, 61 Cal.2d at p. 754 & fn. 2 [the motivating reason for the special standing had been "extensively discussed"].) Private trusts contrast with charitable trusts. In private trusts, benefits from the trust and information about it are concentrated in a way that promotes effective oversight: private individuals get the benefits and have an incentive to notice and to investigate irregularities. But charitable trusts tend to be different. "Beneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in

17

their own behalf." (*Id.* at p. 754.)  Charitable beneficiaries may not even know about the trust.  In any event, they lack realistic incentives to sue.  "The Attorney General may not be in a position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact, and the various responsibilities of his office may also tend to make it burdensome for him to institute legal actions except in situations of serious public detriment." (*Id.* at p. 755.)  This lack of oversight means charitable trusts can lapse into inactivity and neglect and can be victimized by trustee breaches of trust.  When charitable trusts are badly or corruptly managed, underenforcement of the original charitable purpose disserves the public interest in furthering social betterment.  (See also Bogert, *Recent Developments Regarding the Law of Charitable Donations and Charitable Trusts* (1954) 5 Hastings L.J. 95, 95; Bogert, *Proposed Legislation Regarding State Supervision of Charities* (1954) 52 Mich. L.Rev. 633, 635–636; Note, *State Supervision of the Administration of Charitable Trusts* (1947) 47 Colum. L.Rev. 659, 660–661; Comment, *Supervision of Charitable Trusts* (1953) 21 U. Chi. L.Rev. 118, 118–119, 128–129; Cf. *Holt*, *supra*, 61 Cal.2d at p. 754, fn. 2 [citing sources].)

Thus the problem, according to *Holt*, was ineffective oversight of charitable trusts.  *Holt*'s solution was to recognize special standing for cotrustees of a charitable trust to sue other trustees about alleged breaches of trust obligations.  After *Holt*, then, enforcement was not solely in the hands of the Attorney General, as an earlier case had held.  *Holt* expressly disapproved that earlier case.  (*Holt*, *supra*, 61 Cal.2d at pp. 752–757.)

*Holt* opened the door to special standing but opened it cautiously.  The high court was aware that to broaden standing

excessively would be to invite vexatious litigation. Costly litigation would diminish funds that could further the charitable mission.

The basis for *Holt*'s fear is plain. Trusts usually control something valuable, and valuable assets can attract lawsuits. Some suits might be sincere but officious. Others could be simple strike suits.

The *Holt* opinion noted the threat of vexatious litigation. The opinion cited the esteemed Professor Kenneth Karst, who had written that "[t]he reason for the frequently seen statement that the attorney general alone can enforce a charitable trust is of course that *the charity needs to be protected from constant harassment by meddlesome individuals* who have no interest in the charity except as members of the public. This is sound but quite inapplicable to enforcement by the fiduciaries who are both *few in number and charged with the duty of managing the charity's affairs*." (Karst, *The Efficiency of the Charitable Dollar: An Unfulfilled State Responsibility* (1960) 73 Harv. L.Rev. 433, 444–445, fns. omitted, italics added.)

The Restatement Third echoed this concern, noting "[t]he risk of repetitious or harassing litigation . . . underlies the requirement that one who seeks to enforce a charitable trust have a special interest in doing so . . . ." (Rest.3d Trusts, § 94, reporter's notes on com. g(3), p. 20.)

Courts nationwide share this concern. (E.g., *In re United Effort Plan Trust* (Utah 2013) 296 P.3d 742, 750 [Charitable trusts could frequently be subjected to unreasonable and vexatious litigation because beneficiaries are generally some or all of the members of a large shifting class of the public. "This potential for unlimited litigation would be problematic given that

19

charitable trusts are created to serve the public good and have finite resources. The larger the group of individuals that is permitted to meddle with charitable trust management decisions, the more likely that trust resources will be diverted from the trust's charitable, public-good purposes and devoted instead to litigation costs and attorney fees."].)

The *Holt* opinion thus voiced support for the "protection of charities from harassing litigation." (*Holt*, *supra*, 61 Cal.2d at p. 755.)

For more than half a century, *Holt* has been a beacon. The Restatement Third described *Holt* as "frequently quoted" and paid Justice Traynor the compliment of identifying him as its author. (Rest.3d Trusts, § 94, reporter's notes on com. e, p. 14.) Yet in all this time, apparently no case, in California or for that matter anywhere in the United States, has considered whether this special standing rule should extend to trusts that are *revocable* in nature.

The parties cite no such precedent. If that precedent exists, it has eluded our research.

*Holt* did not involve a revocable trust. (See *Holt*, *supra*, 61 Cal.2d at pp. 752–761.)

Neither did leading California cases applying *Holt*. (E.g., *Patton v. Sherwood* (2007) 152 Cal.App.4th 339, 341–342; *L.B. Research & Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 176; *Hardman v. Feinstein* (1987) 195 Cal.App.3d 157, 161–162; *San Diego etc. Boy Scouts of America v. City of Escondido* (1971) 14 Cal.App.3d 189, 192–193.)

World Services made just this point to the probate court: no case involving charitable trusts that were *revocable* has conferred special standing. The proposal is unprecedented.

20

Revocability matters. Whether the settlor can or cannot revoke its trust is a central feature of the trust mechanism.

Revocable trusts differ fundamentally from irrevocable trusts.

In irrevocable charitable trusts, the stage is set for abuse. The settlor has passed from the scene and no longer can vigilantly attend to trust management.

Revocable trusts are different entirely. There the settlor is functioning, can attend to the management of the trust, and presumably is fully in charge. The attentive and displeased settlor, with a figurative snap of the fingers, can revoke the trust and shut down the whole operation. (See § 15401, subd. (a)(2) [settlor can revoke a trust via a signed writing delivered to the trustee].)

The problem of lapsed supervision and attendant mismanagement does not exist when the trust is revocable.

That holds here. Any time the Fellowship decides its trust has gone awry, it can revoke the trust the same way it set up the trust in the first place.

Autonomous Region objects to this analysis, but its objections are not powerful. It alleged it did not first make a written petition to remove World Services as the trustee at the biennial World Service Conference because the conferences "are controlled and managed by World Services itself," meaning "such a petition would have been futile." This allegation is about removing the trustee, however, when the pertinent issue is revocability *of the trust*. Autonomous Region's allegation it would be futile for *Autonomous Region* to act does not mean action by the *settlor* would be futile. Indeed, the Fellowship was able to mobilize itself to establish the trust in the first place, and the

21

trust document announces that the trust, registered in 1993, was amended in 1997, 1998, and 2012.  Moreover, Autonomous Region does not explain how its allegation of control and management can eliminate concern that permitting broad standing would invite meddlesome litigation that diverts trust resources from charitable purposes to legal fees.

At oral argument, Autonomous Region sought to discount the problem of meddlesome litigation in this case.  It said it is seeking only to control recovery literature, not a bounty of trust monies.  But Autonomous Region's petition does seek disgorgement of profits and attorney fees.  And monetary gain need not be the only or even the usual motivation for officious intermeddlers.  Sometimes they are simply officious.  They still can be a costly problem for a settlor who has retained the power to revoke.

Autonomous Region has never explained how it could amend to show it belongs to a group "few in number."  (*Holt*, *supra*, 61 Cal.2d at p. 755.)  To enlarge standing to include every subset of the Fellowship's worldwide membership would be to open the door wide.

Autonomous Region's opening papers argued that, when it comes to special standing, there is no basis for distinguishing between revocable and irrevocable trusts, and Corporations Code section 5142 proves this, for that provision makes no such distinction.  This provision authorizes the following to bring an action to remedy a breach of a charitable trust:

(1) the corporation,

(2) an officer of the corporation,

(3) a director of the corporation,

22

(4) a person with a *reversionary, contractual, or property interest* in the assets subject to the charitable trust, and

(5) the Attorney General, or a person the Attorney General grants relator status.  (Corp. Code, § 5142.)

The argument fails.  Potential beneficiaries of a revocable trust may hope the settlor never revokes the trust, but they have no legal entitlement to prevent the settlor from taking this step.  (E.g., *Giraldin, supra*, 55 Cal.4th at p. 1062 ["The beneficiaries' interest in the trust is contingent only, and the settlor can eliminate that interest at any time."].)  Autonomous Region's opening brief does not explain how this ephemeral hope can amount to a *reversionary, contractual, or property interest*.  This lack of explanation means Autonomous Region has forfeited the argument, for it left World Services without legal substance to oppose.

Autonomous Region professes concern with the public interest in combating the opioid epidemic.  Yet a broader perspective contradicts its position.  The public interest in encouraging charity of every kind is better served by leaving revocable trusts in the hands of the active and on-the-scene settlor that had the resources, desire, and vision to create the charitable trust in the first place.

In short, the common law doctrine of special standing to enforce charitable trusts does not extend to trusts that are revocable.  Autonomous Region's second standing theory is legally incorrect.

D

The probate court properly denied Autonomous Region leave to amend.  Autonomous Region contends it should have been allowed to add facts supporting its interpretation that the

23

trust confers standing on any regional delegate group. The probate court did allow Autonomous Region to develop its new section 15800 argument and to file supplemental briefing replete with extensive offers of proof. The court's interpretation of the trust was correct: as a matter of law, Autonomous Region is not *the* settlor or *a* settlor. The court was also right to rule that, because this trust is revocable, Autonomous Region lacked special standing.

Autonomous Region had the burden to prove it could cure defects in its petition. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) It did not carry this burden.

## DISPOSITION

We affirm the judgment and award costs to the respondent.


WILEY, J.

We concur:


GRIMES, Acting P. J.


STRATTON, J.