**2015 UT App 253**

# THE UTAH COURT OF APPEALS

RALPH SIEBACH AND MURIEL SIEBACH,
Plaintiffs and Appellants,
*v.*
BRIGHAM YOUNG UNIVERSITY,
Defendant and Appellee.

Opinion
No. 20140317-CA
Filed October 8, 2015

Fourth District Court, Provo Department
The Honorable Fred D. Howard
The Honorable David N. Mortensen
No. 130400674

Florence M. Vincent, Spencer H. Reed, and Mark A.
Flores, Attorneys for Appellants

Robert S. Clark, Laura G. Kennedy, Nathanael D.
Paynter, and Stephen M. Craig, Attorneys
for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and KATE A. TOOMEY concurred.

PEARCE, Judge:

¶1     Ralph and Muriel Siebach (the Siebachs) sued Brigham Young University (BYU), seeking, among other forms of relief, the return of charitable donations they had given to BYU. The district court determined that the Siebachs lacked standing to pursue their claims and dismissed their Amended Complaint with prejudice. We affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND[1]

¶2     The Siebachs have donated hundreds of thousands of dollars to BYU over the past several decades. The Siebachs' son, Dr. James L. Siebach (Son), was employed as a philosophy professor at BYU. In 1990, Son asked BYU to establish a research account that would be known as the Rhetorical Studies Account (the RSA). The RSA was to be used exclusively to fund academic research in philosophy at BYU.

¶3     BYU created the RSA and designated it as a restricted account for "Research; Hiring; [and] promotion of any & all aspects of philosophical studies." The RSA was to be funded primarily by private donations. Son was the only person authorized to spend the RSA funds. In the following years, the Siebachs and other donors—three corporations and at least four individuals—contributed approximately $425,000 to the RSA with the understanding that the money would be used to fund Son's research.

¶4     In April 2009, BYU began an audit of the RSA. BYU did not inform the Siebachs or the other donors of the audit. In July 2009, BYU froze the RSA and issued an interim report concluding that the Siebachs' contributions to the account had violated federal tax laws. The interim report also stated that BYU's audit indicated "a significant level of purchases made from the RSA without adequate control or supervision." The interim report concluded that the RSA had been utilized in a

---

1. Because we are reviewing the grant of a motion to dismiss, we recite the background facts as alleged in the Siebachs' Amended Complaint. *See Brown v. Division of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶ 16, 228 P.3d 747 (stating that a claim will survive a motion to dismiss for lack of standing if the claim's "allegations, taken as true, together with all reasonable inferences therefrom, satisfy the requirements of our standing test").

manner that "failed to comply with university policies and procedures," and directed that all future expenditures from the RSA conform to "approved research areas." BYU did not provide the interim report, or communicate its results, to the Siebachs or any other donor.

¶5     On September 9, 2009, BYU accepted an additional $50,000 contribution from the Siebachs. Upon receipt of the donation, BYU unfroze the RSA, deposited the Siebachs' contribution, and then refroze the RSA. On or about September 17, 2009, BYU removed Son as the person authorized to access the RSA. BYU did not inform the Siebachs that it had frozen the RSA or removed Son's authorization to access the RSA.

¶6     BYU issued its final audit report in December 2011. The report concluded that the Siebachs had "a personal interest in making donations to benefit [Son] financially, which conflicts with their avowed charitable interest in supporting the exempt educational purpose of [BYU]." The report also opined that the Siebachs' "intention was to make a gift for a private use rather than for a public benefit," that BYU "was being used merely as a 'conduit' to funnel funds to [Son] from his parents and avoid tax liabilities," and that if the Siebachs donated the funds with the restriction that they only be used by Son, "it would have been seen as an effort to use [BYU] as a conduit for a personal gift in violation of the Internal Revenue Code and [BYU's] policy and established practice."[2] The final report acknowledged BYU's own negligence in failing to enforce university policies regarding the RSA. The report also documented various inappropriate uses of the RSA funds, including personal travel, the purchase of approximately $81,000 in personal items, and other expenditures that "were of doubtful value or no value" to BYU.

---

2. The Siebachs contend that BYU's conclusions and its characterization of "unlawful motives" are "wholly inaccurate."

¶7     The Siebachs eventually became aware of the audit and apparently made their disagreement and displeasure with the audit's conclusions known to BYU. BYU offered to return any unspent funds in the RSA that could be attributed to the Siebachs. However, the Siebachs and BYU could not agree on the precise amount to be refunded. Eventually, BYU offered to return approximately $114,000 to the Siebachs. The Siebachs directed BYU to return that amount but announced that the $114,000 was "less than should be transferred and that they were not waiving any and all claims to the remaining balance BYU promised and is obligated to transfer." The Siebachs also demanded that BYU return, with interest, the entire $50,000 donation they had made in 2009. BYU responded by conditioning the return of money on the agreement of all donors to the RSA and a waiver of further claims by all donors, including the Siebachs.[3] The Siebachs were unwilling or unable to satisfy BYU's conditions, and BYU did not refund any portion of the unspent funds to the Siebachs.

¶8     In 2013, the Siebachs filed suit against BYU, seeking an accounting of their donations to the RSA, a declaratory judgment that BYU should be required to use the RSA funds in accordance with the Siebachs' donative intent, and the return of funds. The Siebachs' complaint included claims of breach of fiduciary duty, declaratory relief, accounting, breach of contract, constructive trust, unjust enrichment, revocation of gift, fraud in the inducement, negligent misrepresentation, and negligent management of the donated funds.

¶9     The district court dismissed the Siebachs' Amended Complaint with prejudice, concluding that they lacked standing to assert their claims. The district court reasoned that, under the general common-law rule, a donor who has made a completed

---

3. BYU also apparently raised its proposed refund amount to approximately $124,000.

gift to a charitable institution lacks standing to bring an action to enforce the terms of the gift and that, in most circumstances, it is only a state's attorney general who has standing to bring such an action. The district court concluded that the Utah Legislature "implicitly adopted the common law rule" when it enacted the Uniform Prudent Management of Institutional Funds Act. The district court further concluded that all of the Siebachs' claims amounted to attempts to enforce their donative intent, observing that it "[could not] comprehend a scenario where the conditions identified by the Siebachs may not be considered terms of a charitable gift, or where the alleged bad acts may not be viewed as failures in complying with the terms of a gift." Accordingly, the district court dismissed the Amended Complaint for lack of standing.

¶10 Before the district court entered a final written dismissal order, the Siebachs filed a motion to reconsider, which BYU opposed. The district court issued its final written order without ruling on the motion to reconsider. The Siebachs filed a notice of appeal. Thereafter, the district court granted the Siebachs' motion to reconsider in part and reinstated their breach of contract claim relating to BYU's offer to return the unspent portion of their RSA donations. BYU objected that the district court lacked jurisdiction to reconsider its final order in light of the Siebachs' appeal. The district court agreed and voided its order reconsidering and reinstating the Siebachs' breach of contract claim. The Siebachs filed another notice of appeal.

¶11 A week after the district court entered its original final order of dismissal, the Siebachs moved to disqualify the assigned judge, Judge Howard, arguing that the judge enjoyed personal and professional relationships with BYU that created a conflict of interest. The motion to disqualify alleged that BYU employed Judge Howard's daughter, a BYU law student, as a legal-writing assistant. The motion also identified three BYU employees who had "disclosed a close relationship" with Judge Howard. The presiding judge, Judge Mortensen, reviewed the motion to disqualify and denied it, concluding that the motion was not

timely and that the grounds asserted did not mandate disqualification of Judge Howard. The Siebachs then filed another notice of appeal. Thus, the Siebachs take this appeal from the district court's order of dismissal, its order voiding the reconsideration order, and Judge Mortensen's denial of the disqualification motion.

## ISSUES AND STANDARDS OF REVIEW

¶12    The Siebachs argue that the district court erred when it concluded that they lacked standing and dismissed their claims with prejudice. "The issue of whether a party has standing is primarily a question of law, which we review for correctness." *R.P. v. K.S.W.*, 2014 UT App 38, ¶ 4, 320 P.3d 1084. When we evaluate standing at the motion-to-dismiss stage, we must treat the allegations contained in the plaintiffs' complaint as true and draw all reasonable inferences in the plaintiffs' favor. *See Brown v. Division of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶¶ 14–16, 228 P.3d 747.

¶13    The Siebachs also argue that the presiding judge erred by denying their motion to disqualify Judge Howard. We review the denial of a motion to disqualify a judge "for correctness." *See In re C.C.*, 2013 UT 26, ¶ 12, 301 P.3d 1000; *cf. Lunt v. Lance*, 2008 UT App 192, ¶ 7, 186 P.3d 978 ("Determining whether a trial judge committed error by failing to recuse himself . . . is a question of law, and we review such questions for correctness." (omission in original) (citation and internal quotation marks omitted)).

¶14    Finally, the Siebachs argue that the district court erred when it concluded that it lacked jurisdiction to reconsider its final order after they filed their notice of appeal from that order. Whether a district court has subject matter jurisdiction is a question of law, which we review under a correction of error standard. *Garver v. Rosenberg*, 2014 UT 42, ¶ 6, 347 P.3d 380.

ANALYSIS

I. Donor Standing to Enforce the Terms of a Charitable Gift

A.      Standing Under the Common-Law Rule

¶15   The district court, applying general common-law principles, concluded that the Siebachs lacked standing to pursue their claims. "At common law, a donor who has made a completed charitable contribution, whether as an absolute gift or in trust, had no standing to bring an action to enforce the terms of his or her gift or trust unless he or she had expressly reserved the right to do so." *Carl J. Herzog Found., Inc. v. University of Bridgeport*, 699 A.2d 995, 997 (Conn. 1997) (footnote omitted); *see also Hardt v. Vitae Found., Inc.*, 302 S.W.3d 133, 137 (Mo. Ct. App. 2009); *Courtenay C. & Lucy Patten Davis Found. v. Colorado State Univ. Research Found.*, 2014 WY 32, ¶ 34, 320 P.3d 1115 (Wyo. 2014).

¶16   Under the general common-law rule, only the attorney general, and not the donor, has standing to enforce the terms of a completed charitable gift. *Courtenay C. & Lucy Patten Davis Found.*, 2014 WY 32, ¶ 34 ("At common law, only the attorney general may enforce the terms of a charitable gift."); *see also Carl J. Herzog Found., Inc.*, 699 A.2d at 997–98; Evelyn Brody, *From the Dead Hand to the Living Dead: The Conundrum of Charitable-Donor Standing*, 41 Ga. L. Rev. 1183, 1209 (2007) ("[C]ourts have extended the settlor's traditional lack of standing to donors who make restricted gifts (not in trust) to corporate charities, again leaving enforcement to the attorney general in all but the unusual case."); Mary Grace Blasko et al., *Standing to Sue in the Charitable Sector*, 28 U.S.F. L. Rev. 37, 40–42 (1993) (tracing the historical development of the common-law rule); *cf. In re United Effort Plan Trust*, 2013 UT 5, ¶ 26, 296 P.3d 742 ("Under the common law rule, suits to enforce the terms of charitable trusts generally may not be maintained by trust beneficiaries."). Donors have traditionally been "prevented from enforcing their gifts in court, because non-trustee donors retain[] no interest in

the gift, except the sentimental one that every person who [has] contributed to the charity would be presumed to have." *Hardt*, 302 S.W.3d at 137 (citation and internal quotation marks omitted).

¶17    The Siebachs do not dispute that the common law generally precludes a donor from suing to enforce the terms of a charitable gift.[4] Instead, they argue—correctly—that no Utah case has expressly applied the common-law rule of donor standing. But it does not ineluctably follow that the district court therefore erred in applying the common-law rule. Indeed, Utah courts have consistently looked to the common law to resolve questions of standing. *See, e.g.*, *Jones v. Barlow*, 2007 UT 20, ¶¶ 15–29, 154 P.3d 808 (evaluating standing under the common-law doctrine of "in loco parentis"); *Washington County Water Conservancy Dist. v. Morgan*, 2003 UT 58, ¶¶ 17–27, 82 P.3d 1125 (applying "the established common law test for standing"); *Architectural Comm. of Mount Olympus Cove Subdivision No. 3 v. Kabatznick*, 949 P.2d 776, 778–79 (Utah Ct. App. 1997) (applying the common-law doctrine of associational standing). We see no error in the district court's reliance on the common law to evaluate the Siebachs' standing to press claims relating to their donative intent.

¶18    The Siebachs do not argue on appeal that, absent legislation on the subject, the common law should not govern the issue of donor standing. Nor do they articulate any reason why Utah would be ill-served by the common-law donor-

---

4. At least one American jurisdiction has expanded the common-law rule to permit donor standing in some circumstances. *See Smithers v. St. Luke's–Roosevelt Hosp. Ctr.*, 723 N.Y.S.2d 426, 434–36 (App. Div. 2001). However, the Siebachs do not argue that *Smithers* altered the general common-law rule that donors to charitable institutions lack standing to enforce their donative intent.

standing rule. In the absence of such argument, we cannot conclude that the district court erred in ruling that Utah follows the common-law rule and that, under the rule, the Siebachs lack standing to enforce the terms of their charitable gifts to BYU. The district court therefore did not err in dismissing the Siebachs' claims that sought to enforce their donative intent.[5]

B.       The Uniform Prudent Management of Institutional Funds Act

¶19     Rather than directly attack the common-law rule, the Siebachs focus much of their argument on the district court's conclusion that Utah's Uniform Prudent Management of Institutional Funds Act (UPMIFA) implicitly adopted the common-law rule of donor standing. *See* Utah Code Ann. §§ 51-8-101 to -604 (LexisNexis 2010 & Supp. 2014). The district court acknowledged that UPMIFA does not expressly address donor

---

5. The Siebachs argue that their claims should not have been dismissed on standing grounds without an opportunity for them to conduct discovery. However, the district court may grant a motion to dismiss premised on a lack of standing so long as the court treats the allegations in the plaintiffs' complaint as true and draws all reasonable inferences in the plaintiffs' favor. *See Brown v. Division of Water Rights of Dep't of Nat. Res.*, 2010 UT 14, ¶¶ 14–16, 228 P.3d 747.

    The Siebachs also argue that the district court erred in dismissing their donative-intent claims with prejudice rather than without prejudice. We agree with BYU that this issue was not presented to the district court and was therefore not preserved for our review. *See generally 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (alterations in original) (citation and internal quotation marks omitted)).

standing, but the court observed that the uniform act that the Utah Legislature used as the model for UPMIFA contains prefatory language stating that "the attorney general continues to be the protector both of the donor's intent and of the public's interest in charitable funds." *See* Uniform Prudent Mgmt. of Institutional Funds Act prefatory note, 7A U.L.A. 9 (Supp. 2014). The district court also referenced the Legislature's instruction in UPMIFA that, "[i]n applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." *See* Utah Code Ann. § 51-8-604 (LexisNexis 2010). The district court then noted that other states that have enacted a version of the uniform act have "interpreted [the uniform act's] silence on the standing issue as a continuation of the common law doctrine regarding donors' lack of standing to enforce gift terms." *See, e.g.*, *Hardt v. Vitae Found., Inc.*, 302 S.W.3d 133, 138–39 (Mo. Ct. App. 2009) (relying on the uniform act's prefatory language to conclude that Missouri's version of the act did not grant donor standing); *cf. Carl J. Herzog Found., Inc. v. University of Bridgeport*, 699 A.2d 995, 1002 (Conn. 1997) ("Nothing in our review supports the conclusion that the legislature, in enacting CUMIFA, implicitly intended to confer standing on donors."). In light of the uniform act's prefatory language, an absence of legislative history indicating a contrary result, and the case law of sister states, the district court concluded that UPMIFA "implicitly adopted the common law rule denying standing to donors of completed charitable gifts."

¶20 The Siebachs raise several challenges to the district court's consideration of UPMIFA in its standing analysis. The Siebachs argue that the district court erroneously concluded that UPMIFA governed their claims because the donated funds were not "institutional funds" for UPMIFA purposes and were thus not regulated by UPMIFA, *see* Utah Code Ann. § 51-8-102(7)(a) (LexisNexis Supp. 2014); that the Legislature's failure to expressly incorporate the common-law doctrine against donor standing into UPMIFA indicates that the Legislature "must *not*

have intended to adopt that doctrine"; that the district court erroneously applied UPMIFA to donations that occurred prior to its enactment in 2007; and that the district court's interpretation of UPMIFA violates the Utah Constitution's open courts provision by abolishing the Siebachs' existing remedies, *see* Utah Const. art. I, § 11.

¶21    The Siebachs' UPMIFA arguments are largely misplaced because the district court ultimately relied on the common-law rule to determine that the Siebachs lacked standing. The district court may have overstated the Legislature's intent when it concluded that UPMIFA "implicitly adopted the common law rule." UPMIFA is silent on the question of donor standing. Nevertheless, UPMIFA appears to be entirely consistent with the common law on the issue of donor standing, and the two should be read harmoniously.

¶22    Whether UPMIFA precludes the district court's application of the common-law donor-standing rule presents a question of preemption. "Statutes 'may preempt the common law either by governing an area in so pervasive a manner that it displaces the common law' (field preemption) 'or by directly conflicting with the common law' (conflict preemption)." *R.P. v. K.S.W.*, 2014 UT App 38, ¶ 28, 320 P.3d 1084 (quoting *In re Estate of Hannifin*, 2013 UT 46, ¶ 10, 311 P.3d 1016). We cannot say that UPMIFA governs the donor–donee relationship so pervasively that UPMIFA "[leaves] no room for the [common law] to supplement it," *id.* (second alteration in original) (citation and internal quotation marks omitted), and there is certainly no direct conflict between UPMIFA's silence and the common-law donor-standing rule. Indeed, UPMIFA's silence appears to have been designed to accommodate the common-law rule. As the district court noted, the prefatory note to the uniform act suggests that "the attorney general continues to be the protector both of the donor's intent and of the public's interest in charitable funds." Uniform Prudent Mgmt. of Institutional Funds Act prefatory note, 7A U.L.A. 9 (Supp. 2014); *cf. Hardt*, 302 S.W.3d at 138–39 (relying on the uniform act's prefatory

language to conclude that Missouri's version of the act did not grant donor standing). To the extent the Siebachs argue that the Legislature preempted and rejected the common-law rule when it enacted UPMIFA, we disagree and conclude that UPMIFA did not preempt the common-law donor-standing rule. *Cf. Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 29, 61 P.3d 989 (Durham, C.J., dissenting) ("The legislature is presumed to know the common law which existed before the enactment of a statute, and absent an indication that the legislature intends a statute to supplant common law, the courts should not give it that effect." (citation and internal quotation marks omitted)).

¶23　Our conclusion that the common-law donor-standing rule precludes the Siebachs' donative-intent claims disposes of the Siebachs' other arguments that the district court misapplied UPMIFA to dismiss their claims. Because the common law, and not UPMIFA, governs the Siebachs' standing, it is irrelevant whether the donated funds were "institutional funds" under UPMIFA. And the common-law rule applies to all of the Siebachs' donations, whether or not those donations predated UPMIFA's enactment in 2007.

¶24　The Siebachs also argue that the district court's dismissal of their donative-intent claims violates the Utah Constitution's open courts provision, which states,

> All courts shall be open, and every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel any civil cause to which he is a party.

Utah Const. art. I, § 11. The Utah Supreme Court has interpreted the open courts provision to generally prohibit the abrogation of an existing cause of action. *See Scott v. Utah County*, 2015 UT 64,

¶ 52. However, the common-law donor-standing rule has been applied almost universally to prohibit the kinds of donative-intent claims the Siebachs seek to prosecute. *See* Iris J. Goodwin, *Donor Standing to Enforce Charitable Gifts: Civil Society vs. Donor Empowerment*, 58 Vand. L. Rev. 1093, 1145 (2005) ("To return to the particulars of the current law with respect to donor standing, nearly all the modern American authorities—decisions, model acts, statutes, and commentaries—deny a donor standing to enforce a restricted gift to public charity absent express retention of a reversion in the donative instrument."). In light of the widespread acceptance of the common-law rule, the Siebachs have not demonstrated that the district court's dismissal of their donative-intent claims for lack of standing implicated Utah's open courts provision by abrogating an existing cause of action.

C.      Special-Interest Standing

¶25     The Siebachs claim the district court erred by rejecting their argument that they qualified for an exception to the common-law donor-standing rule because they possessed a "special interest" in enforcing their donative intent. Specifically, the Siebachs argue that they have special-interest standing to pursue their donative-intent claims because BYU's offer to return the unspent portion of the donations gave the Siebachs "some pecuniary interest" in the funds. *See Warren v. Board of Regents of Univ. Sys. of Ga.*, 544 S.E.2d 190, 192–93 (Ga. Ct. App. 2001) (providing that a suit may be maintained by a "person who has a *special interest* in the enforcement of the charitable trust").

¶26     The test to determine whether an interest is "special enough to confer standing is whether the person is entitled to receive a benefit under the [gift or] trust that is not merely the benefit to which members of the public in general are entitled." *State ex rel. Nixon v. Hutcherson*, 96 S.W.3d 81, 84 (Mo. 2003) (citation and internal quotation marks omitted); *see also Warren*, 544 S.E.2d at 192–93; Mary Grace Blasko et al., *Standing to Sue in the Charitable Sector*, 28 U.S.F. L. Rev. 37, 61 (1993) (identifying

five "elements" from cases "across state jurisdictions" that "influence a court's willingness to allow a private party to sue for the enforcement of charitable obligations"). As with the donor-standing rule itself, there is no Utah case expressly adopting the special-interest exception.[6] We will assume without deciding that, in Utah, a charitable donor who can establish an individualized pecuniary interest in donated funds has special-interest standing to enforce that pecuniary interest.

¶27 The Siebachs have not, however, alleged that they retained a pecuniary interest in the donated funds after the gifts were completed, such as by retaining an express reversionary interest in the funds, *see* Goodwin, *Donor Standing to Enforce Charitable Gifts*, 58 Vand. L. Rev. at 1145, or by receiving a benefit from the donation separate from the public at large, *see State ex rel. Nixon*, 96 S.W.3d at 84. Rather, the Siebachs claim they qualify for the special-interest exception because *after* a dispute over the use and management of the funds arose, BYU offered to return the unspent portion.

¶28 BYU's alleged promises to return unspent funds may or may not be enforceable in their own right. *See infra* ¶¶ 38–41. But allegations of post-gift promises do not alter the conclusion that the Siebachs relinquished all pecuniary interest in the donated funds at the time they completed their gifts. We are not

---

6. In the related context of beneficiary standing to enforce the terms of a charitable trust, the Utah Supreme Court has recognized that some courts have created a "narrow exception" to the donor-standing rule, allowing suits by beneficiaries "deemed to have a 'special interest' in the administration of a charitable trust." *In re United Effort Plan Trust*, 2013 UT 5, ¶ 27, 296 P.3d 742 (citation omitted). However, the supreme court noted that it has "not yet recognized this 'special interest' exception" and that "the contours of the exception are ill-defined." *Id.*

persuaded by the Siebachs' attempt to bootstrap BYU's alleged post-gift promises to return unspent funds into special-interest standing to enforce their original donative intent.[7]

## D.     Traditional Standing

¶29    The Siebachs argue that even if Utah recognizes the common-law donor-standing rule, not all of their claims are barred by that rule. This argument appears to implicitly concede that some, if not most, of the Siebachs' claims seek to enforce their "donative intent." However, the Siebachs argue that their fraud and negligent misrepresentation claims, as well as one of their breach of contract claims,[8] are "independent from the donative intent claims and should not have been dismissed."

### 1.     Fraud and Negligent Misrepresentation

¶30    The Siebachs claim that BYU induced their donations with false or misleading statements about how the funds would be used and managed. *See generally Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991) (reciting the elements of fraud); *Atkinson v. IHC Hosps., Inc.*, 798 P.2d 733, 737 (Utah 1990) (discussing negligent misrepresentation claims). The Siebachs emphasize that their fraud and negligent misrepresentation claims differ from their donative-intent claims because they are

---

7. As discussed below, this does not mean that the donor-standing rule prevents the Siebachs from bringing an action based upon a separate post-donation contract, should they be able to plead such a claim.

8. The Amended Complaint asserts two separate breach of contract claims, one based on an alleged contract formed at the time of the Siebachs' gifts and one arising from BYU's later promise to return unspent funds. The first breach of contract claim seeks to enforce the Siebachs' donative intent and is therefore barred by the common-law donor-standing rule.

based on BYU's communications to the Siebachs to *induce* their donations rather than on the Siebachs' communications to BYU limiting the use of the gifts. Nevertheless, the district court concluded that the fraud and misrepresentation claims were barred by the donor-standing rule because BYU's alleged "bad acts" could be viewed only as "failures in complying with the terms of a gift."

¶31 The Siebachs argue that the common-law donor-standing doctrine "has not been applied to prevent donors from suing charitable organizations for fraud" and assert that "[t]here is no question that a donor may sue when a gift is induced by fraud." As authority for these propositions, the Siebachs cite to cases from Utah and other jurisdictions. *See Lynch v. MacDonald*, 367 P.2d 464, 470 (Utah 1962); *Patterson v. Leonard*, 200 So. 759, 761 (Ala. 1941); *In re Estate of Saathoff*, 295 N.W.2d 290, 295 (Neb. 1980); *Camp St. Mary's Ass'n of W. Ohio Conf. of the United Methodist Church, Inc. v. Otterbein Homes*, 889 N.E.2d 1066, 1076–79 (Ohio Ct. App. 2008); *Kjensbek v. Charity Bd. of Lutheran Bhd.*, 267 P. 521, 522 (Or. 1928).

¶32 The cases the Siebachs cite do not directly address the common-law donor-standing doctrine, much less hold that fraud and misrepresentation claims are categorically exempt from that doctrine.[9] Nevertheless, these cases support the proposition that courts around the country have recognized the standing of donors to allege the fraudulent or negligent inducement of their donations. *See also Maffei v. Roman Catholic Archbishop of Bos.*, 867 N.E.2d 300, 311 (Mass. 2007) (stating, with regard to donors' negligent misrepresentation claim, that "it is clear that the plaintiffs have alleged individual stakes in this dispute that

---

9. The district court did not cite—nor has BYU provided—any authority stating that the common-law donor-standing rule applies to inducement-based claims like fraud or negligent misrepresentation.

make them, and not the Attorney General, the parties to bring suit"); *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 831–32 (Miss. 2009) (allowing fraud claim by donors who alleged intentional misrepresentations in soliciting contributions for the rebuilding of a church).

¶33 The Utah Legislature has also treated the inducement of charitable donations differently from a charity's obligation to manage donated funds in compliance with a donor's expressed intentions. UPMIFA governs a charitable institution's post-donation management of funds. *See* Utah Code Ann. §§ 51-8-101 to -604 (LexisNexis 2010 & Supp. 2014). However, the Charitable Solicitations Act addresses the *solicitation* of funds by charitable institutions. *See id.* §§ 13-22-1 to -23 (2013 & Supp. 2014).

¶34 The Charitable Solicitations Act is aimed at preventing charitable fraud and prohibits the "making of any untrue statement of material fact" in connection with a charitable solicitation. *See id.* § 13-22-13(3) (2013); *see also American Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000) ("The [Charitable Solicitations] Act's general declarations and specific prohibitions clearly target fraud."). The Charitable Solicitations Act allows for the prosecution of charity fraud actions by the state of Utah, but also states—in the section of the Act making a violation a misdemeanor—that "[n]othing in this section precludes any person damaged as a result of a charitable solicitation from maintaining a civil action for damages or injunctive relief." Utah Code Ann. § 13-22-4(2) (LexisNexis 2013). Thus, the Charitable Solicitations Act anticipates donors personally seeking damages when their donations are procured by fraud.

¶35 We conclude that claims alleging the improper *inducement* of a charitable donation are distinguishable from claims seeking to enforce donative intent and that improper-inducement claims do not fall within the common-law donor-standing rule. The common-law rule is based on the precept that a donor relinquishes his or her personal interest in an unrestricted

charitable gift once the gift is complete, and thereafter it becomes the duty of the attorney general to vindicate the public interest in ensuring that charitable organizations use donated funds appropriately. *See Carl J. Herzog Found., Inc. v. University of Bridgeport*, 699 A.2d 995, 997–98 (Conn. 1997). But, when a donor alleges that fraud or negligent misrepresentation induced a charitable gift, it cannot be said that the donor freely relinquished his or her property to the charity such that only a general public interest in the matter remains. In this case, the Siebachs' Amended Complaint alleges that their donations to the RSA were induced by fraud or negligent misrepresentation. Those claims fall outside the reach of the common-law donor-standing rule, and the district court erred by dismissing them.

¶36 BYU urges us to affirm the district court's dismissal on the alternate ground that the Siebachs have failed to adequately plead their fraud and misrepresentation claims. *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record . . . ." (citation and internal quotation marks omitted)). Although we possess the ability to affirm on any legal ground or theory apparent on the record, we also possess the discretion to conclude that the district court should be afforded the opportunity to rule on the arguments in the first instance. *See Bailey*, 2002 UT 58, ¶ 10. In this matter, we conclude that on the record before us, the district court is better positioned to initially consider BYU's arguments concerning alleged deficiencies in the Siebachs' Amended Complaint, as well as any argument the Siebachs might advance that they should be allowed to remedy any such deficiencies.

¶37 We therefore decline BYU's invitation to affirm on alternate grounds. We reverse the district court's dismissal of the Siebachs' fraud and misrepresentation claims and remand for further proceedings.

2.      BYU's Alleged Promises to Return Unspent Funds

¶38    The Siebachs also argue that the district court erred by concluding that the common-law donor-standing rule deprived them of standing to pursue the breach of contract claim that was based on BYU's alleged post-gift promises to return the unspent portion of their donations. We agree.

¶39    The Siebachs allege that BYU breached an agreement to return the unspent RSA funds that were attributable to their donations. The Siebachs support this claim with allegations that they requested that BYU return funds to them and that BYU, on multiple occasions, offered to return a portion of the Siebachs' donations. To the extent that these various offers and requests created an enforceable agreement, that agreement did not involve donative intent. Rather, it would represent the settlement of an existing dispute between the parties.[10] Settlement agreements are enforceable contracts. *See McKelvey v. Hamilton*, 2009 UT App 126, ¶ 28, 211 P.3d 390 ("The basic rules of contract formation are used to determine whether two parties have entered into an enforceable settlement agreement."). The Siebachs have standing to enforce such a contract even if they lack standing to enforce their donative intent. Much like our holding that the Siebachs may not rely on BYU's alleged post-gift promises to obtain special-interest standing to enforce their original donative intent, the district court erred by relying on the nature of the parties' original dispute to deny standing to enforce an alleged agreement to settle that dispute.

¶40    Again, BYU urges us to uphold the dismissal of the breach of contract claim on an independent ground. *See Bailey*, 2002 UT 58, ¶ 10. BYU argues that the Amended Complaint does not adequately plead the existence of a contract and therefore, the breach of contract claim must fail. The Amended Complaint

---

10. We express no opinion on whether the Amended Complaint actually alleges the existence of an enforceable contract.

may or may not adequately state a claim for breach of contract based on an alleged settlement agreement. But, as with the Siebachs' fraud and misrepresentation claims, the district court should evaluate this argument in the first instance. We therefore reverse the district court's dismissal of the Siebachs' breach of contract claim relating to BYU's post-gift promises to return unspent funds.

¶41    We conclude that the Siebachs lack standing to pursue claims aimed at enforcing their donative intent. This includes their causes of action for accounting, declaratory relief, breach of fiduciary duty, breach of contract arising from the terms of their gifts, revocation of gift, constructive trust, unjust enrichment, and negligent management of the donated funds. Each of these claims seeks to enforce the donative intent underlying the Siebachs' gifts and can be prosecuted only by the attorney general. However, the Siebachs do have standing to pursue their fraud and negligent misrepresentation claims, because those claims allege improper inducement of the gifts rather than BYU's failure to use the gifts in accordance with the Siebachs' intent. Similarly, the common-law donor-standing rule does not prevent the Siebachs from pressing a claim that BYU allegedly promised to return their unspent donations, because that claim seeks to enforce a separate post-gift promise rather than the terms of the gifts.

## II. Denial of the Siebachs' Motion to Recuse

¶42    The Siebachs next argue that Presiding Judge Mortensen erred when he denied their motion to disqualify Judge Howard. The Siebachs sought Judge Howard's disqualification because BYU employed his daughter and because three BYU employees "disclosed a close relationship" with Judge Howard. Judge Mortensen denied the motion as untimely and also because it failed to set forth sufficient grounds for disqualification.

¶43 We affirm Judge Mortensen's ruling based on his conclusion that the Siebachs' motion was untimely.[11] The Utah Rules of Civil Procedure required the Siebachs to file their disqualification motion no later than twenty days after "the date on which [they] learn[ed] or with the exercise of reasonable diligence should have learned of the grounds upon which the motion is based." Utah R. Civ. P. 63(b)(1)(B)(iii) (2013).[12] The Siebachs asserted that their counsel learned of the factual basis for their disqualification motion on March 29, 2014. Judge Mortensen ruled that the Siebachs therefore should have filed their motion by April 18 and that the Siebachs' April 21 motion was untimely. Judge Mortensen also ruled that "the majority of the information asserted in the affidavit in support of the motion to disqualify could have been learned long before March 29, 2014 through the exercise of reasonable diligence."

¶44 The Siebachs do not challenge those factual findings. Instead, they argue that the twenty-day filing period should have run from the date that their counsel *verified* the information about Judge Howard rather than the date upon which they *learned* that information. The Siebachs argue that this result necessarily flows from rule 11 of the Utah Rules of Civil Procedure, which provides that every court filing certifies the filer's "knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*," that the filing has evidentiary support. *See* Utah R. Civ. P. 11(b) (emphasis added). The

---

11. Because we affirm on the basis of untimeliness, we do not address the substance of the arguments the motion raised and express no opinion on the merits of those arguments.

12. Rule 63 was amended effective May 1, 2014, to provide for a twenty-one-day filing period. *See* Utah R. Civ. P. 63(b)(1)(B) & amendment notes (2015). The Siebachs did not argue below, nor do they argue on appeal, that the district court should have applied the amended rule in evaluating the timeliness of their disqualification motion.

Siebachs assert that their attorneys verified the information about Judge Howard on April 1, rendering their April 21 filing timely if the twenty days began to run on the date of verification.

¶45   We see no support for the Siebachs' argument in rule 63's language. Rule 63's clock begins to tick on the date that a party learns or should have learned of the grounds for disqualification, not on the date a party's counsel verifies that counsel has, or is likely to have, evidentiary support for the allegations and factual contentions in the motion. Accordingly, reading rules 11 and 63 together, counsel should complete a reasonable inquiry into the grounds for disqualification within the time that rule 63 contemplates. Reading the rules as the Siebachs urge would undercut the policy behind the timely resolution of disqualification motions by allowing counsel a potentially unlimited time period to investigate before triggering rule 63's deadline.[13]

¶46   In addition, Judge Mortensen ruled that the Siebachs could have discovered the information about Judge Howard "long before March 29" if they had exercised "reasonable diligence." This constitutes a separate and independent ground for Judge Mortensen's ruling. *See* Utah R. Civ. P. 63(b)(1)(B)(iii) (calculating the time period for filing a disqualification motion from the date that a basis for the motion was discovered or should have been discovered "with the exercise of reasonable diligence"). The Siebachs do not challenge this aspect of Judge Mortensen's order.

---

13. The Siebachs do not argue that the twenty-day deadline provided their counsel with insufficient time to investigate the grounds underlying the disqualification motion. In this case, the Siebachs acknowledge that their attorneys took only three days to verify the information about Judge Howard, leaving them over two weeks to prepare and file a timely disqualification motion.

¶47 Rule 63 expressly allows a reviewing judge to "deny a motion not filed in a timely manner." *Id.* R. 63(b)(3)(C). The Siebachs have not established that Judge Mortensen erred in concluding that their motion to disqualify was untimely, and we affirm the denial of their motion on that basis.

### III. The Siebachs' Motion to Reconsider

¶48 Finally, the Siebachs argue that the district court erred when it concluded that it lacked jurisdiction to reconsider its dismissal order once the Siebachs had filed their notice of appeal. *See Garver v. Rosenberg*, 2014 UT 42, ¶ 10, 347 P.3d 380 ("Once a notice of appeal is filed, jurisdiction transfers from the district court to the appellate court for most matters in the case."). We need not decide this question because it is moot. The relief the district court extended and then retracted on the Siebachs' motion for reconsideration is included in the relief we grant the Siebachs on appeal—the reinstatement of their breach of contract claim based upon BYU's alleged promises to return the Siebachs' unspent donations. Thus, the Siebachs have already obtained the relief that we could grant if we were to agree with their jurisdictional argument, and we decline to address that now-mooted issue. *See State v. Black*, 2015 UT 54, ¶ 10 ("An issue becomes moot if during the pendency of the appeal circumstances change so that the controversy is eliminated, thereby rendering the relief requested impossible or of no legal effect." (citation and internal quotation marks omitted)).

### CONCLUSION

¶49 We conclude that the common-law donor-standing rule precludes the Siebachs from asserting causes of action seeking to enforce their donative intent, and we agree with the district court that most of the Siebachs' claims are barred for that reason. We reject the Siebachs' arguments that they have standing under the "special interest" exception to the common-law donor-

standing rule. However, the Siebachs' fraud and negligent misrepresentation claims do not seek to enforce their donative intent and thus fall outside the common-law rule. Similarly, the Siebachs' breach of contract claim arising from BYU's alleged promises to return unspent funds does not seek to enforce the Siebachs' donative intent. We reverse the district court's dismissal of those three claims and remand for further proceedings. We do not reach the Siebachs' argument concerning their motion to reconsider, because our remand of the ruling dismissing the breach of contract claim moots that portion of the appeal. In all other respects, including Judge Mortensen's denial of the Siebachs' motion to disqualify Judge Howard, we affirm the district court.

———————